## Downs v. Security Trust Company.

(Decided May 25, 1917.)

### Appeal from Fayette Circuit Court.

1. Trusts—Revocation.—The power of revocation reserved in a trust deed must be strictly followed as therein provided, in order to effectuate a revocation either of the trust or of the uses therein appointed.

2. Trusts—Cancellation.—Where a young man on account of insobriety and urgent debts conveys his property in trust during his natural life, and the trustee so administers the estate as to provide money with which to satisfy the indebtedness, but the grantor continues his habits of drunkenness and is afflicted with alcoholism, the purposes of the trust not being accomplished, the chancellor will deny the petition of the grantor to cancel the deed of trust and restore him his property.

ROBERT B. FRANKLIN and ROBERT C. TALBOTT for appellant.

SHELBY, NORTHCUTT & SHELBY for appellees.

Opinion of the Court by Judge Sampson—Affirming.

This action was instituted in the Fayette circuit court by Walter W. Downs, on August 24, 1915, against the Security Trust Company, of Lexington, Kentucky, seeking to cancel a deed and revoke a trust created thereby. Downs is a young man about twenty-eight years of age, and unmarried. His father and mother are both dead. He has one married sister living in Fayette county. He has never been engaged in any business, calling or occupation, except that after his father's death, he came into the possession of a tract of land of one hundred, fifty-four acres, the basis of this action, which he rented to tenants, and collected the rents. For some years before the execution of the deed, on December 2, 1910, Downs was addicted to the excessive use of intoxicating liquors to such an extent as to be unable to attend to his business, or to manage his affairs. On one or more occasions it was necessary to confine him in a sanitarium for treatment of the disease commonly called alcoholism. He was also, at that time indebted to numerous persons to the amount of three thousand dollars, or more, and some of these creditors were very insistent and were about to commence legal proceedings. He was unable to raise money with which to satisfy these creditors, and being in a sanitarium under treatment of Dr. Holliday for troubles arising from a protracted drunk, he made application, through his physician, to the Security Trust Company, of Lexington, for permission to make said institution his trustee for the holding, management and control of his estate, which consisted chiefly of this farm. After several conferences, matters were arranged, and the deed, now sought to be cancelled, was executed by Downs to the Security Company in trust for the uses named therein. He was the sole beneficiary. The company accepted the trust, and immediately began, and have since continued, to exercise the duties thereof, and to carry out the objects for which it was created. The Trust Company advanced sufficient money to pay off the indebtedness of young Downs, and leased or let the lands so as to produce an income from the farm. It took in charge all his affairs in accordance with the terms of the deed, and after two years sold the land at the price of one hundred, seventy dollars per acre, which was, to say the least, a very advantageous trade, because land owners living in and near this property testify that its value

was approximately one hundred, twenty-five dollars, to one hundred, forty dollars, per acre. This sale realized for the trustee something more than twenty-five thousand dollars, and up to the taking of proof in this case the trustee had collected rents and profits from the farm, and interest from the money invested after the sale, which added to the sale price brought the grand total up to $34,362.30. After paying the debts of Downs, contracted previous to the execution of the deed, as well as those subsequent, and advancing him such necessary sums as his living expenses required, there remained something more than twenty-one thousand dollars at the time of the commencement of this action, which the Trust Company had judiciously invested in earning securities. Downs took up his abode first with one of his cousins in the country, and later moved into the city of Lexington and boarded. He did not follow any occupation, or pretend to earn a livelihood. Very frequently he drank to excess, and it was necessary for him to have medical attention at a sanitarium on account thereof. All these expenses were duly paid by the trustee from funds in its hands.

Becoming tired of the arrangement which he had voluntarily entered into, Downs instituted this action to revoke the trust and to cancel the deed of December 2, 1910, creating the trust, because, as he alleges, the purposes of the trust have been accomplished; his debts paid, and his health recovered to such an extent as that he is able to manage and control his affairs, and this being true, he avers there is no longer any necessity for the relationship.

The Trust Company answered admitting the execution of the deed and the existence of the trust, but denied that Downs has been restored to health, as alleged in his petition, and averred that he was yet given over to excessive indulgence in the use of intoxicating liquors, and as a consequence thereof, habitually in such condition as to incapacitate him for the business of properly attending to or managing his estate. The answer also alleged that the estate would be endangered by the revocation of the trust, and the trustee submitting the whole matter to the circuit court, offered to resign the trust and to settle its accounts, but recommended that the trust be continued until the trustor, by sober conduct, had shown himself capable of managing his estate.

By reply issue was joined. Thereupon voluminous depositions were taken. The plaintiff, Downs, in his testimony, admitted the execution of the deed and its regularity, but insisted that he had recovered his health, which was but another way of saying that he was no longer an inebriate; that his debts had been paid, and that he was fully competent to manage his affairs. He also said that he wished to revoke the trust *in toto,* because the objects for which it was originally created had ceased to exist, and that he desired now to go into business on his own account. He admitted, however, that he had never engaged in any business except to rent his farm and collect the rents, and this he also admitted he squandered. He also testified that he had worked as a clerk in a country store for about one month at one time, and for about a week at another time, and this appears to have been his only employment covering a period of some years, except that he declared he helped on the farm, but in what way or to what extent is not made clear. He called other witnesses to prove in substance the same facts, and one or more of these witnesses stated that in their judgment Downs was capable of managing his business.

The evidence for the trustee was quite to the contrary. It called several physicians, including those that had control of and managed the sanitarium in which Downs had been confined during his sickness, resulting from insobriety. One of these physicians stated that the trouble was alcoholism and that it was a disease; that on one or more occasions Downs suffered from delirium tremens and was wild. On the first visit to the sanitarium Downs' condition was such that he soon rallied from the attack and he was discharged. Upon the second visit, the trouble was more serious and it took a longer time to relieve the patient, and upon the third visit Downs was in a precarious condition, verging on mental collapse, from which it took a much greater time to relieve him. The doctor testified that he advised Downs at the time of his release from the sanitarium that a continuance of his former conduct would bring on chronic dementia, and warned him not to again indulge in strong drink. This last attack was after the commencement of this action, and at a time when he was seeking to have the trust revoked, because he had regained his health and was able to control and manage his estate. The three physicians, who attended him, further testified that Downs' lack of willpower and weakness of character, rendered him an easy

prey to strong drink, and that more than likely, if temptations offered, he would return to his old habits.

The chancellor, after due consideration, declined to cancel the deed or to revoke the trust, and dismissed the petition of plaintiff without prejudice to a future action, however, intimating that the deed might be cancelled and the trust revoked in a future action, provided Downs should prove himself to be sober and competent to manage his estate. From this judgment Downs appeals, insisting:

1st. That the lower court erred in overruling his demurrer to the answer of the Trust Company; and

2nd. That drunkenness was not one of the consideratons expressed in the deed of trust, and that the expression "bad health" in said deed had no reference whatever to drunkenness, and could not therefore be urged in avoidance of a revocation of the trust.

3rd. That the objects of the trust have been satisfied, and that there is now no reason for a continuance of the relation, he being the sole beneficiary; and,

4th. The deed of trust expressly reserved the right in Downs to revoke the trust *in toto.*

The answer alleges that the deed of trust was executed because at the time Downs was addicted to excessive drinking and practically habitually intoxicated, and was in consequence incapacitated to look after or care for his estate, and that the trustee refused to assent to the revocation, because the same considerations which induced the making of the deed still existed; that is to say, "The plaintiff has been and still is given over to excessive indulgence in the use of intoxicating liquors, and as a consequence thereof, is habitually in such condition as to incapacitate him for business or properly attending to or managing said estate"; and that a revocation of the trust would in effect amount to wasting and dissipation of his property, leaving him without support; and the answer further denied that "plaintiff is in a better condition in point of health, referred to in the deed of trust, or that he is now able to attend personally to his affairs so far as the management of the trust fund is concerned." The answer presented a good defense in equity, and the demurrer was properly overruled.

The conclusion is irresistible that the sickness referred to in the deed of trust is and was none other than drunkenness or alcoholism. The consideration recited in the trust deed is as follows:

. "That, whereas, party of the first part has incurred debts to a considerable amount, which are due and which first party is desirous of paying, and it has become necessary to provide a means for paying off same, and

"Whereas, owing to the bad health of the party of the first part and his consequent inability to attend personally to his business, and the danger arising therefrom that his estate be wasted and diverted from the support and maintenance of himself and his family, the party of the first part for and in consideration of the premises, and of one dollar cash in hand paid to him."

Alcoholism is a disease and so regarded by the medical profession, but the draughtsman in the preparation of the deed, out of consideration for the grantor, refrained from the use of the words "drunkenness" and "alcoholism," and employed the words "bad health." But it cannot be seriously insisted that it was not clearly understood by both the grantor and grantee and those acting for them in the execution of the deed of trust that the sickness or "bad health" was such as grew out of and resulted from the excessive use of ardent spirits. There was no fraud or mistake charged, and none existed; but by mutual consent the words "bad health" were employed instead of the harsher term "drunkenness" or "alcoholism," and of this the appellant, Downs, should not complain, since it was done in his interest. The "bad health" or "sickness," therefore, had not abated at the institution of this action. In fact, it seems that the most aggravated attack appeared some weeks after the commencement of this suit. While it is shown that at the time of the taking of the deposition Downs had been sober for some three or four months, the experts, who treated him for the disease, gave it as their opinion that a temptation, such as the handling of a large sum of money, would be too great for his strength and would likely cause a return to his old habits. It is, therefore, clear, from the evidence, that the purposes and objects of the trust had not been fully accomplished at the institution, or trial, of this cause in the lower court.

The deed of trust was not subject to revocation unless by the terms of paragraph four thereof, which is as follows:

"Said party of the first part, however, expressly reserves the right and power to revoke by deed any or all the uses, created and declared by this deed with the assent of the party of the second part, and by said party of

the second part uniting in said deed, and to appoint said property hereby conveyed or any part or parts thereof, with which assent so expressed, to such other and further uses and trusts as he may from time to time elect and desire; and in the event of such revocation and new appointment the said party of the second part shall then hold the property in respect of which such power shall have been exercised to and for the uses and trusts so declared and appointed by party of the first part; it being understood, however, that the exercise of such revocation and new appointment shall not in any wise affect such of said property as may have been prior thereto sold or mortgaged by said party of the second part pursuant to the power hereinbefore conferred upon it. And in case the party of the first part desires to revoke any or all the uses created and declared by this deed, and the party of the second part refuses to assent thereto and to unite in said deed, then the circuit court of Fayette county on petition of party of the first part and proper notice to all persons interested therein, in its discretion may modify, annul or cancel this conveyance."

The rule of construction applicable to all deeds, requires the entire instrument be read and considered together so as to arrive, if possible, at the intention and purpose of the parties to it, and applying this rule in this case, we conclude the grantor intended to vest the trustee with the fee simple title to the property in trust for the uses therein named, and such as he might in the future, by deed, appoint with the assent of the trustee, the trust to continue through the life of the trustor, he to receive such part of the residue of the income from the estate after the payment of fixed charges, as in the judgment and discretion of the trustee was reasonably necessary for his maintenance and support, the trustor "divesting and exempting himself hereby, of all estate in and to said property and its rents and profits," but in the event of a new appointment, by deed, of the uses of the trust by the trustor, and a failure of the trustee to assent to such new appointment and to join in the deed, then in such event, the whole matter could, upon proper petition of the trustor, be presented to the Fayette circuit court, which court, in its discretion, "may modify, annul or cancel" any or all such uses. Looking to the purposes and intent of grantor, as well as the trustee, in the making of the deed, we conclude that Downs was actuated by fear of danger more from within than from

without, and he purposed to so fix his property and estate as to place it beyond his power to waste or dissipate it. He did not reserve to himself the right to revoke the trust absolutely, or to cancel the deed, but only to make such changes in the uses of the trust, with the assent of the trustee, as might from time to time appear proper to him. But, in order that he might not act irrationally, he wisely provided a check upon his own actions, requiring the assent of the trustee to such new appointment before it could become effective.

We do not regard the reference in the deed to the Fayette circuit court, as adding or detracting in any manner whatever, to or from the power of revocation expressed in the deed, because without such stipulation that court would, on proper petition, have assumed jurisdiction of the matter contemplated. Certainly this was not a reservation of a power to revoke. If the court should act, and in its discretion cancel any or all the uses or even the deed, this would not be a revocation; and, aside from this, it would not be the act of the creator, but the decree of the court. To revoke means to call back, to recall; and since the deed did not proceed from the court, it can not recall or revoke it, but it may, upon sufficient showing, cancel or annul it, but only in exceptional cases.

When a deed of trust provides a particular mode of revocation, an effective revocation may be made only by pursuing that mode. 39 Cyc., page 94; Carpenter v. Cook, 132 California 621; Tudor v. Bail, 195 Mass. 18; Lippincott v. Williams, 63 N. J. Eq. 130. The mode provided for a revocation of the uses named in the deed in this instance was by deed by the trustor, and to which the trustee assents and in which it joins, and in case of refusal of assent by the trustee, the trustor, by proper petition, may apply to the Fayette circuit court to modify, annul or cancel any such use. It was the evident purpose of the grantor in the deed to vest the trust company with the legal title to the lands mentioned during his natural life. Nevertheless, a trust will determine when the purposes and objects for which it was created cease to exist. The debts of the trustor, which was one of the compelling influences that brought about the trust, have been fully satisfied, but the other object denominated "bad health," continues to exist. It was not, therefore, within the power of the trustor to revoke

the trust absolutely, nor even to modify the uses, except with the assent of the trustee. This may at first appear harsh, but it must be remembered that the trustor is the voluntary creator of the trust and the grantor in the deed, and he does not complain that there was fraud, duress or undue influence employed in procuring the deed. Neither does he allege that he was mentally, or otherwise, incapacitated to execute the deed on December 2nd, 1910, the date of its delivery.

We, therefore, conclude that the chancellor committed no error in denying plaintiff the relief sought.

Let us indulge the hope that Walter W. Downs may cease to drink to excess and fully recover from the disease of alcoholism. What should be the decree of the chancellor should he regain his normal health, his debts being paid, and the objects of the trust fully accomplished, is now unnecessary to decide. But, until he has continued in the way of sobriety for a sufficient length of time to reasonably satisfy the chancellor that his purpose is to so continue, and that he is fully healed of alcoholism and is capable of managing and controlling his estate, the objects of the trust are unsatisfied, and it would be unwise to grant the prayer of such petition.

Judgment affirmed.