## HACKLEY UNION NATIONAL BANK *v.* FARMER.

1. TRUSTS—REVOCATION—DELIVERY—MAIL.

    Mailing by donor of letter to trustee containing certified copy of instrument revoking trust constituted ''delivery'' under terms of trust agreement providing for delivery of revocation instrument to trustee.

2. SAME—TRUSTEE MAY INSIST THAT REVOCATION BE IN MANNER PROVIDED FOR.

    Trustee owes duty to itself and donor to insist that trust indenture be revoked in manner provided for therein.

3. SAME—REVOCATION BY MAILING CERTIFIED COPY.

    Execution and acknowledgment by donor before notary in Germany of formal instrument revoking trust agreement, and mailing certified copy thereof to trustee by donor was sufficient to work revocation under its terms providing that it might ''be revoked by the donor at any time during his life by instrument in writing signed and acknowledged by the donor and delivered to the trustee,'' although original was retained by notary under laws of Germany, and certified copy was not received by trustee until after donor's death.

4. EVIDENCE—CERTIFIED COPY.

    Certified copy of document may be treated as original where executed in foreign country, and original is retained by notary under laws of that country.

5. TRUSTS—JUDICIAL DETERMINATION OF REVOCATION.

    Trustee, being in doubt whether trust agreement had been revoked by donor's mailing to it certified copy of revocation instrument which was not received until after donor's death, properly applied to courts for judicial determination.

6. SAME—LEGAL EXPENSES.

    Provision in trust agreement that trustee be recompensed for all legal expenditures incurred included expenses of trustee's suit to determine whether trust had been revoked.

    McDONALD and POTTER, JJ., dissenting.

Exercise of reserved power of creator to revoke or procure cancellation of trust, see annotation in 38 A. L. R. 961.

Appeal from Muskegon; Cross (Orien S.), J., presiding.  Submitted June 17, 1930.  (Docket No. 82, Calendar No. 35,069.)  Decided January 7, 1931.

Bill by Hackley Union National Bank against Edward C. Farmer, administrator with will annexed of the estate of Heinrich Ernst Eugen Meurer, deceased, and legatees under the will, to determine whether a trust agreement had been revoked.  From a decree declaring the trust in full force and effect, defendants appeal.  Reversed.

*Butterfield, Keeney & Amberg,* for plaintiff.

*Edward C. Farmer* and *John W. Van Gordon,* for defendants Farmer, Malblanc, Voith, Technische Hochschule and Burschenschaft Alemannia at Technische Hochschule in Stuttgart, Wurtemberg.

*Cross, Foote & Sessions,* for defendant Meurer.

*Knappen, Uhl, Bryant & Snow,* for defendant Hackley Hospital.

McDonald, J. (*dissenting*).  This bill was filed to determine whether a certain trust agreement has been revoked.  The agreement was between Heinrich Ernst Meurer, creator of the trust, and the Hackley Bank of Muskegon, Michigan, trustee.  The instrument contained the following power of revocation:

"Notwithstanding the provisions of the preceding paragraphs, this instrument and all and singular the trusts created hereby, may be revoked by the donor at any time during his life, by instrument in writing signed and acknowledged by the donor and delivered to the trustee."

During the year following the execution of the trust agreement, the donor and his wife went to Germany for a visit. While there he was taken sick and died on October 24, 1927. Just before his death, he executed a will and another instrument purporting to be a revocation of the trust agreement. This instrument was signed and acknowledged, and a certified copy thereof mailed to the trustee together with a letter from the donor stating that he had revoked the trust in its entirety. These papers were not received by the trustee until after the donor's death. The facts thus briefly outlined present a question as to the validity of the revocation. The trial court held there had been no revocation in compliance with the terms of the power reserved in the trust agreement.

Mr. Meurer was born and educated in Germany. He attended college at Stuttgart. He belonged to a college fraternity. In the trust agreement, he created a fund for the college and the fraternity to be paid at the termination of the trust, but subject to the condition that, if for any reason the gifts to them or either should fail, the remainder would belong to the Hackley Hospital of Muskegon. Upon filing this bill, in which they were made parties, the college and the fraternity filed disclaimers of any interests in the litigation and of any rights and benefits to be derived under the trust agreement. After the trial court had decided against the validity of the revocation, they asked to withdraw their disclaimers and to file their answers to the bill of complaint. They were permitted to do so over the objection of counsel for the Hackley Hospital, who contend that, immediately on the filing of the disclaimers, the gifts to them failed and their interests under the trust became vested in the hospital. The

trial court denied this contention on the theory that the disclaimers were filed under a mistake as to their legal rights.

Two questions are presented for our consideration, first, was there a revocation according to the terms of the power reserved in the trust agreement, and, second, what was the legal effect of the filing of disclaimers by the college and the fraternity?

*The Revocation.* It is the contention of the plaintiff that the instrument of revocation was without effect because it was not delivered to the trustee during the lifetime of the donor. It is contended by all of the defendants, except the Hackley Hospital, that delivery was complete and the revocation became effective immediately when a certified copy of the original instrument was deposited in the mail addressed to the trustee during the lifetime of the donor.

A determination of this issue requires an interpretation of the power of revocation reserved in the trust agreement. It provides that the donor might revoke,

"At any time during his life, by instrument in writing signed and acknowledged by the donor and delivered to the trustee."

If possible, the language of the power should be construed so as to carry out the intention of the donor in making the reservation. There is no doubt that whatever delivery was intended, it was to be accomplished during the lifetime of the donor. There is no doubt as to what was intended by the requirement that the instrument of revocation be signed and acknowledged. These were acts essential to the revocation, and must be precisely performed to make it effective. The difficulty arises in ascertain-

ing what the donor intended as to delivery. The plaintiff contends that the term was used in a strictly legal sense, that a physical delivery was intended, and that until such delivery was made of the instrument the revocation was not to become effective. The defendants argue against a delivery in a strictly legal sense. They contend that an intention to deliver, accompanied by some overt act in carrying out that intention, is all that was meant to be done to make the revocation effective. It is our view that any act which will accomplish the purpose of the parties in requiring delivery is sufficient to give effect to the revocation. It is not a question of a good or legal delivery. If the purpose of requiring it is accomplished, it is immaterial whether the instrument of revocation is in the mail or on the trustee's desk at the time of the donor's death. Delivery is not essential to complete a revocation unless made so by the parties in the trust agreement. What was the purpose in requiring it here? Obviously it was not for the protection of the trustee. The law will do that regardless of delivery or other notice. It is a fair inference that, in requiring delivery, the parties intended to establish the fact of revocation during the lifetime of the donor, to make sure the status of the trust at that time, to cause a surrender of the instrument, if one were made, so that some stranger or interested person could not give it vitality by an unauthorized delivery after his death. Any act of surrender to the trustee that would put the original instrument of revocation beyond the owner's power to alter or to destroy would accomplish the purpose in requiring delivery. This could be done by deposit in the mail as well as by physical delivery. If the donor had deposited the original instrument in the mail prop-

erly addressed to the trustee, the purpose would have been accomplished, the delivery, in the sense that it was used in the power, would have been complete, and the revocation would have become effective at once. But he did not do that. He retained the original instrument and mailed a. certified copy. Having retained the original, he could have altered or destroyed it the next day or at any time prior to his death. If he had done so, of what effect would have been the certified copy? Delivery of the copy meant nothing more than a notice of revocation, and that is not what the power required. It required a delivery of the original. As this. was not done, we must hold that the trust was not revoked in the manner provided in the agreement. The trial court was right in holding that the attempted revocation was without force or effect.

The remaining question relates to the legal effect of filing disclaimers by the college and the fraternity.

The trial court held that they were made and filed by the parties under a mistake as to their legal rights and that a court of equity should relieve them of their mistake.

It is a well-established general rule that equity will not relieve against a mistake of law, that a party is bound by an instrument he executes with full knowledge of the facts though he is mistaken as to its legal effect. This rule is applied as well where the mistake of law is due to the erroneous advice of counsel. But there are exceptions to the general rule. Where a party in good faith is not mistaken as to the legal effect of the instrument he executes, but is mistaken as to his antecedent existing legal rights affected thereby, equity will correct his mistake. This principle has been stated by our

court in *Renard* v. *Clink,* 91 Mich. 1 (30 Am. St. Rep. 458), as follows:

"But where a person is ignorant or mistaken with respect to his own antecedent and existing private legal rights, interests, or estates, and enters into some transaction, the legal scope and operation of which he correctly apprehends and understands, for the purpose of affecting such assumed rights, interests, or estates, equity will grant its relief, defensive or affirmative, treating the mistake as analogous to, if not identical with, a mistake of fact."

This principle applies to the facts in the case at bar. The college and the fraternity had full knowledge of the facts; they understood the purpose and effect of making their disclaimers of all interest in and benefits under the declaration of trust, but, because of the attempted revocation, they were mistaken as to their antecedent existing legal right to the trust fund. In view of the law and the facts, the trial court was right in permitting a withdrawal of the disclaimers and the filing of answers to the bill of complaint.

The decree of the circuit court should be affirmed, with costs to the plaintiff.

POTTER, J. (*dissenting*). The contract made between the donor of the trust and the trustee provided:

"This instrument and all and singular the trusts created hereby, may be revoked by the donor at any time during his life by instrument in writing signed and acknowledged by the donor and delivered to the trustee."

This language evidences the contract. Its terms are simply and plainly expressed. It states the

rule of action governing the donor of the trust and the trustee—the law of the case. The donor to revoke was bound to do so according to the terms of the contract. Revocation in no other way could be safely recognized and acted upon by the trustee. This was the clear obligation of the contract imposed upon the trustee and the donor of the trust. This court cannot alter or amend the contract; it cannot substitute another and different method of revocation for that agreed upon by the parties and stipulated in the contract. It cannot impair the obligation of the contract entered into between the donor of the trust and the trustee. The contract was made in Michigan. Its revocation provided for was to be performed, if at all, in Michigan. *John A. Tolman Co. v. Reed,* 115 Mich. 71; *Millar v. Hilton,* 189 Mich. 635. This contract was not revoked in the manner provided for by its terms. There is no claim it was so revoked, and therefore it was not legally revoked at all.

BUTZEL, C. J. The decree of the lower court should be reversed and one entered holding that the trust indenture was duly revoked. As stated by Justice McDONALD, the mailing of the letter with its inclosure was sufficient delivery under the terms of the indenture. The letter revoking the trust in unequivocal terms was accompanied by a certified copy of a formal instrument of revocation, duly signed, witnessed, and acknowledged before a notary who kept the original and gave donor a copy in accordance with the provisions of the civil law as adopted in Germany and other countries of Continental Europe. A careful reading of the record and briefs shows that the mental capacity to revoke is not at issue. The revocation was absolute and un-

conditional. It directed plaintiff to turn over the property to two certain parties who the letter, accompanying the certified copy, stated were the executors of donor's estate under his will. The letter requested plaintiff to continue the administration of the estate until disposed of by the parties mentioned in the revocation. The revocation was separate and distinct from the will that was drawn at the same time. The revocation took immediate effect during testator's lifetime.

The sole question over which we are not in accord is whether, when the donor finds it necessary to execute and acknowledge an instrument and does so in the manner provided for by the laws of the country where he happens to be, and the compliance with the requirements of the trust indenture is such a substantial one, and the deviation, if any, so slight, a court of equity should hold the revocation to be effective. In turning over property for reinvestment and safeguarding to an experienced and responsible trustee, with or without the reservation of the power of revocation by the donor, as is so frequently done, the rights of the parties must be observed. A trustee owes the duty to itself and the donor to insist that the trust indenture be revoked in the manner provided for. In determining whether this was done, we find but little help in the cases to which our attention has been called.

In *Digge's Case* (1598), 1 Co. Rep. 173a (76 Eng. Rep. 373), the power of revocation required that the deed be enrolled. There was no enrollment, and the court held that the revocation was not complete. In *Ellison* v. *Ellison* (1802), 6 Ves. Jr. 656 (31 Eng. Rep. 1243), the revocation was held ineffective because the indenture required two witnesses and only one signed. In *Hawkins* v. *Kemp* (1803), 3 East, 410

(102 Eng. Rep. 655), the power of revocation required that the instrument be attested by three witnesses and be enrolled, and that all of the trustees were to join. The deed was not enrolled, and one trustee failed to join, although he gave his consent by means of a general power of attorney to the settlor. It was held that there was no revocation, the court saying:

"If these circumstances be unessential and unimportant, except as they are required by the creators of the powers, they can only be satisfied by a strictly literal and precise performance. They are incapable of admitting any substitute; because these requisitions have no spirit in them which can be otherwise satisfied."

In *Wright* v. *Wakeford* (1812), 4 Taunt. 213 (128 Eng. Rep. 310), it was held that a power of revocation, which required that the instrument be attested by two or more credible witnesses, was not carried out, when the attestation was only to the sealing and not to the signing. In *Arundell* v. *Phillpot* (1688), 2 Vern. 69 (23 Eng. Rep. 654), the power of revocation was reserved upon the tender of a guinea, but there was no tender. The court in holding that there was no revocation, said:

"This court may supply an informal or defective revocation, but cannot make a revocation where there is none. And therefore either prove a tender of the guinea, or that Mrs. Phillpot declared she intended to revoke the former settlement, one or other of them shall be sufficient, though it hath not all the formalities and circumstances mentioned in the power of revocation, so it appear to be a sober solid act, and done *animo revocandi,* but that could not be made out."

When the revocation must be by deed, the courts have uniformly held that a letter, notice, will, or other instrument lacking the essentials of a deed was insufficient. *Digge's Case, supra; Piggot* v. *Penrice,* Gilb. Rep. 137 (25 Eng. Rep. 96); *Brown* v. *Fidelity Trust Co.,* 126 Md. 175 (94 Atl. 523); *Lippincott* v. *Williams,* 63 N. J. Eq. 130 (51 Atl. 467); *Carpenter* v. *Cook* (6 Cal. Unrep. Cas. 410), 60 Pac. 475.

Where the notice of instrument of revocation is not executed by all of the parties required by the trust indenture, it was held to be ineffective. *Richardson* v. *Stephenson,* 193 Wis. 89 (213 N. W. 673, 52 A. L. R. 681); *Croker* v. *Croker* (117 Misc. Rep. 558), 192 N. Y. Supp. 666; *Kelley* v. *Snow,* 185 Mass. 288 (70 N. E. 89); *Downs* v. *Security Trust Co.,* 175 Ky. 789 (194 S. W. 1041) (where the instrument required also the trustee's assent, or the order of the court). Upon the trustee's refusal, the court refused to interfere because donor was still addicted to an excessive use of alcohol. *In re Barnett,* L. R. Eng. (1908), 1 Ch. 402, and in *Tudor* v. *Vail,* 195 Mass. 18 (80 N. E. 590) the revocation was held to be ineffective, but the facts in no way resemble those of the present case.

In *Scrope's Case* (1610), 10 Co. Rep. 143b (77 Eng. Rep. 1143), Scrope covenanted to stand seized to certain uses, reserving a general power of revocation. Later, he covenanted to stand seized to other uses, and it was held that by so doing he revoked the trust, although no intent to revoke was shown. In *Sale* v. *Freeland* (1680), 2 Chan. Rep. 212 (21 Eng. Rep. 660), the power of revocation provided for a deed to be executed in the presence of three witnesses. Notwithstanding the fact that only two witnesses signed the instrument, it was held a

good revocation, because it appeared that it was signed by a third person who failed to sign as a witness in the presence of others who did sign. In *Burdett* v. *Spilsbury* (1842), 10 Cl. & Fin. 340 (8 Eng. Rep. 772), the power of revocation provided that it be signed, sealed, and published in the presence of and attested by three or more witnesses, and was attested as follows: "Witnesses, C. B., E. B., A. B." It was held that the power of revocation was effective. A special verdict shows that the will was signed, sealed, and published as required. This case practically overrules *Wright* v. *Wakeford*, *supra*.

In *Cowlishaw* v. *Hardy* (1857), 25 Beav. 169 (53 Eng. Rep. 601), the power of revocation provided for its execution by deed in the presence of two witnesses. There was an inconsistency between the trust and the deed, but it was held that a deed attested by two witnesses revoked the trust, although no intent to revoke appeared.

In *Vincent* v. *Bishop of Sodor* (1849), 8 C. B. 905 (137 Eng. Rep. 764), the power of revocation required that it be "signed and published in the presence of, and attested by, two or more credible witnesses." The revocation was held good although the only publication was in the attestation clause, which read: "Signed and sealed in the presence of."

In *Schreyer* v. *Schreyer*, 101 App. Div. 456 (91 N. Y. Supp. 1065) (affirmed in 182 N. Y. 555 [75 N. E. 1134]), although the attempted revocation did not comply with the statute, the court held that it nevertheless was effective, and stated:

"While section 153 of the real property law requires that the consent of a necessary person to the execution of a power must be expressed in the in-

strument by which the power is executed, or in a written certificate thereon, executed and acknowledged in like manner as deeds are required to be executed, yet where the act of revocation as between the parties expresses a clear intention to revoke and the rights of third persons are in nowise affected and the trust instrument in itself does not provide in particular form how the revocation shall be executed, an instrument which clearly expresses the intention to revoke and is sufficient to accomplish such a purpose will be regarded as working such a result, even though it be not executed in the particular form required by the statute.''

In *Gaither* v. *Williams,* 57 Md. 625, where there was a general power of revocation, it was held that the giving of a mortgage on the trusteed property by the settlor, without any other act on his part, was sufficient revocation. In *Barnard* v. *Gantz,* 140 N. Y. 249 (35 N. E. 430), it was held that the signing of a document revoking the trust, but not delivered, was sufficient. In *Sims* v. *Brown,* 252 Mo. 58 (158 S. W. 624), under a general power of revocation, the giving of a warranty deed by the settlor conveying trustee's land was held to be a sufficient revocation.

It will be seen that the facts in most of the cases where the revocation was held to be ineffective are far different from those of the present case. Here we have not the lack of a deed, or of a necessary witness, or the consent of some necessary party. The only defect claimed in the case at bar is that the original revocation, duly acknowledged, was not sent to the trustee, but a certified copy was sent in its place. The lack of the original is made up by the letter of transmission in which the donor revoked the instrument and also inclosed a certified copy of the original instrument of revocation with the copy

of the acknowledgment.   The trustee, however, claims that this was ineffective because it did not receive the original revocation with the acknowledgment, which remained under the law with the notary.   Is this such an important deviation from the requirements of the instrument so that the revocation became noneffective?   We do not believe so, in view of the fact that the donor carried out the terms of the power of revocation when he executed and acknowledged a revocation and sent the trustee a certified copy of it.

Under the civil code, which is the law of Germany, as of other countries of Continental Europe, a notary public, or "notar," as he is called, occupies a quasi-judicial position of much higher import than that of a notary in this country.   The method of taking acknowledgments is prescribed by law. The notary, as a rule, retains the original document and only delivers a certified copy thereof to the maker of the instrument.   The law, as stated in "The Principles of German Civil Law," by E. J. Schuster, on page 90, is as follows:

"A public act consists of one or more declarations made before a judge or public notary, in the presence of certain prescribed additional witnesses, stating by word of mouth the terms of the transaction requiring authentication, or confirming terms set out in a written document delivered to the officiating judge or notary.   The act is evidenced by the minutes taken down by the officiating judge or notary, who together with the parties and the additional witnesses must sign the same.   If the declarations confirm the terms of a written document, such document must be attached to the minutes.   As a general rule State law requires the minutes and all documents annexed thereto to be kept with the offi-

cial records of the judge or notary before whom the act is authenticated, the parties being entitled to receive certified copies.''

The effect of a copy instead of the original document was fully discussed in *Smith* v. *Townsend*, Dallam's Texas Decisions, 569. It was held that a certified copy of a document could be treated the same as an original when the latter was executed in a foreign country, where, in accordance with the laws, the original was kept by the notary. The case so fully discusses the law and gives citations of such authorities of value that we quote quite fully:

"Justice Story in delivering the opinion of the court in '*Owings* v. *Hull*' (9 Pet. [U. S.] 607, 625), after noticing the high credit and authenticity of contracts and other acts, executed before notaries in Louisiana and in all other countries using the civil law, proceeds to state, that 'where a contract, or other act is executed in a particular manner before a notary, the *protocol* or original remains in his possession *apud acta;* and the act is deemed, what is technically called, an "authentic act;" and a copy of such act, certified as a true copy by the notary, who is the depository of the original, or his successor, is deemed proof of what is contained in the original, for the plain reason, that the original is properly in the custody of a public officer and not deliverable to the parties.' He refers to the *Civil Code of Louisiana* from Art. 2231 to 2250. It was decided, that the absence of the original being duly accounted for by its remaining in possession of the notary, 'the copy being duly proved was properly admissible in evidence.'

"In the case of *Mitchell* v. *The United States* (9 Pet. [U. S.] 711, 732) objection was made to the admission of copies of certain acts of confirmation of Indian sales made by Governor Folet. It was not sustained. The court say, that 'the deeds of con-

firmation were made according to the rules of the civil law adopted by Spain, and in force in Florida and Cuba; the original is a record and preserved in the office, which cannot be taken out; a *testimonio,* or copy is delivered to the party, which is deemed to be and is certified as an original paper, having all the effect of one in all counties governed by the civil law.' The instruments produced were regarded by the court as original deeds of confirmation. Their authenticity as public documents was proved, and the official signatures were established by the testimony of witnesses.

"Adverting now to such Spanish works as are within reach of the court, we find Sala, in his fourth book treating, but briefly, of the execution of public instruments and their force and effect when introduced in evidence. We have not discovered in this work any satisfactory solution of the question under consideration. In *book 3, tit. 7, of the Institutes of Aso and Manuel,* p. 297, it is laid down, that a 'public instrument is divided into three classes; the original draft, register, or *protocol*—the original—and the copy. The register is the original draft, or writing, which is delivered and remains in possession of the escribano, which we also call *protocol;* by which doubts are determined, that may be offered with respect to the instruments which are copied from it. The deed which is immediately copied from the *protocol* is the original, which causes faith; inasmuch as it is authorized by the public escribano, before whom it passed, or by him to whom the *protocols* of the latter have passed; but if another escribano copies it, with the authority of the judge and citation of the party, it is valid.'

"In 3 *Partidas, tit. 19, law 9,* notaries are required to have a book to serve as a register, in which they must write the minutes of every act required by the contracting parties; from which they draw up the public act itself and deliver it to the person

entitled thereto. In a note to this law a decree is referred to, from which doubtless may be deduced the practice of executing notarial instruments, as known in this country under its former laws and governments. In this decree dated in 1503, notaries were required to draw up on their registers the original act in full; and not by notes, or minutes. A copy is then furnished the party to serve him instead of the act itself, which was formerly made out from such notes. (*Febro. Lib. Escrie, ch. 16, Nos. 3 and 9.*)"

The following provisions are translated from "Die Gesetze Des Reiches under Preussens uber die Freillige Gerichtsbarkeit, text-Ausgabe mit Sach-register" (Laws of the Reich and Prussia concerning voluntary judicial proceedings, text edition with register of subject), page 100:

"*Art.* 42. The original of the judicial and notarial protocol concerning the legalization of legal business remains in the possession of the court or notary.

"*Art.* 43. A copy in duplicate of the protocol can only be given by the court or the notary who has possession of the original document. * * *

"*Art.* 44. Upon cause shown, that the original document is wanted in a foreign country, it may with the consent of the persons who according to Art. 49, Sub. 1, can demand a duplicate copy, be surrendered. If this takes place, a duplicate copy shall be left to remain and stated on the same, to whom and on which day the original was surrendered. The copy so retained takes the position of the original document."

Under article 44, the original document might have been withdrawn on cause shown that it was to be used in a foreign country. A copy was sent by donor containing his signature, as well as those of

the witnesses, of the notary, the official high court counsellor and the official signing for the director of the chancellorship, which were all typewritten, but they are all certified to by one Bohn, counsellor for department of State of Wurtemberg, Germany, who with a rubber stamp attached the official seal thereto.

Subsequent to the execution of the revocation and after the death of the donor, the original was sent to this country for the purpose of this very suit, but in some manner not disclosed by the record or briefs, it was lost. A photostatic copy, however, had been made of it and was introduced in evidence. It shows the original signatures of all the parties whose names are set forth in the typewritten copy, and also contains a certification duly signed and sealed by the vice-consul of the United States in which he states that Bohn was a counsellor in the department of State of Wurtemberg "duly commissioned and qualified, to whose official acts faith and credit are due." There appears to be no question about the authenticity of the documents. Plaintiff claims that it has no right to honor the revocation because the copy mailed in the lifetime of donor did not comply with the requirements of the indenture. We do believe that there was such a substantial compliance that it effectively revoked the trust, the provisions of which were not so mandatory in character as to frustrate donor's revocation made and sent in the manner and under the circumstances as herein stated. Donor acted in accordance with the laws of Germany, and while it is true that upon cause shown he might have obtained and sent the original document, the certified copy was effective.

Plaintiff being in doubt properly applied to the courts for a judicial determination. A clause in the

trust indenture provides that the trustee be recompensed for all legal expenditures incurred. This includes all expenses of this litigation. Whatever doubts it may have had as to the effectiveness of the revocation are dispelled by this opinion. The decision of the lower court is reversed, and it is held that the trust was properly revoked. A decree may be entered accordingly.

WIEST, CLARK, SHARPE, NORTH, and FEAD, JJ., concurred with BUTZEL, C. J.